IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



UNITED STATES OF AMERICA

v.

KEITH J. GRAY (01)

No. 3 - 24 CR - 250 - E

Related to Case No. 22-CR-267-S

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Defendant and Related Entities

1.      Axis Professional Labs, LLC ("Axis") was a Texas company with its principal place of business at 4887 Alpha Road, Farmers Branch, Texas 75244, within the Northern District of Texas, that purported to operate as a clinical testing laboratory. Axis maintained an account at Bank-1 ending in x6498 ("Axis Account").

2.      Kingdom Health Laboratory, LLC ("Kingdom Lab") was a Texas company with its principal places of business at various times at 4887 Alpha Road, Farmers Branch, Texas 75244, within the Northern District of Texas, that purported to operate as a clinical testing laboratory. Kingdom Lab maintained an account at Bank-2 ending in x2168 ("Kingdom Lab Account"). Axis and Kingdom Lab are collectively referred to as "the

Indictment—Page 1

Laboratories." Defendant **Keith J. Gray**, through his ownership and control of other companies described herein, owned, controlled, and operated the Laboratories.

3. Parameno Holdings, LLC ("Parameno Holdings") was a Texas company with its principal place of business at 4887 Alpha Road, Farmers Branch, Texas 75244, within the Northern District of Texas, that owned Kingdom Lab.

4. Kingdom Health Holdings, LLC ("KHH") was a Texas company with its principal place of business at 4887 Alpha Road, Farmers Branch, Texas 75244, within the Northern District of Texas, that owned Axis.

5. Parameno Health Services, LLC ("Parameno Health") was a Texas company with its principal place of business at 4887 Alpha Road, Farmers Branch, Texas 75244, within the Northern District of Texas, that purported to perform billing services on behalf of the Laboratories and other entities.

6. KJ Gray Holdings, LLC ("KJ Gray Holdings") was a Texas company with its principal place of business at 5805 Boston Lane, McKinney, Texas 75070, within the Eastern District of Texas. **Gray** was the sole owner of KJ Gray Holdings, which in turn owned Parameno Holdings, KHH, and Parameno Health. KJ Gray Holdings maintained an account at Bank-2 ending x7720 ("KJ Gray Holdings Account").

7. American Health Screening LLC ("AHS") was an Indiana company with its principal place of business at 451 Pebble Way, Greenwood, Indiana, that purported to provide marketing services to laboratories and other medical providers. AHS maintained an account at Bank-3 ending in x6377 ("AHS Account").

8. Scott Wohrman and David Heneghan owned, controlled, and operated AHS.

9.     Company-1 was a Florida company with its principal place of business at 78 SW 7th Street, Miami, Florida, that purported to provide communications technology and other services to laboratories and medical providers.

10.     Company-2 was a Florida company with its principal place of business at 5041 Woodland Bay Drive, Belmont, North Carolina, that purported to provide marketing services to laboratories and other medical providers.

11.     Co-conspirator-1 owned, controlled, and operated Company-2.

### The Medicare Program

12.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

13.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

14.     Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and

laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

15.     Physicians, clinics, and other health care providers, including laboratories (collectively, "providers"), that provided services to beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

16.     When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

17.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were

responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

18.     CMS contracted with Novitas Solutions, Inc. ("Novitas") to administer Medicare Part B claim payments in Texas, which included claims for laboratory services. Each time that a laboratory provider submitted a claim to Medicare, the laboratory provider certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations. The claims were generally submitted electronically.

19.     To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

20.     In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Medicare would not reimburse providers, including clinical

laboratories, for any items or services procured through the payment of illegal kickbacks and bribes.

## Genetic Testing

21.     Genetic tests were laboratory tests that used DNA sequencing to identify specific inherited mutations in a patient's genes.

22.     Genetic tests were performed to identify mutations that could increase an individual's risk of developing various diseases and conditions such as cancer, cardiovascular disease, dementia, Parkinson's disease, and diabetes, or that could increase susceptibility to adverse drug reactions.  Certain types of genetic tests could also assist in the treatment or management of disease.

23.     Cardiovascular genetic tests ("cardio genetic tests") were laboratory tests designed to identify mutations in genes that could increase an individual's risk of developing various cardiovascular diseases and conditions in the future, or to assist in the treatment or management of patients with a confirmed or suspected diagnosis of an inherited cardiovascular disease.  This type of testing was not intended as a routine screening tool for the general population, nor was it indicated when patients presented with common conditions such as a history of hypertension.  Instead, the tests were used by cardiologists in limited circumstances, for example, to identify an individual's future risk when a genetic variant related to cardiovascular disease had previously been found in a family member, or to inform clinical management of individual diagnosed with a condition resulting from an inherited genetic mutation.

24.     In order to have a genetic test performed, an individual provided a saliva sample using a buccal (cheek) swab, which collected a specimen containing DNA material. The specimen was then transmitted to a laboratory for testing.

25.     DNA specimens were submitted to laboratories together with test requisitions that identified the patient, the patient's insurance and other personally identifiable information, the diagnosis purportedly supporting the test, and the specific genes to be examined.  In order for laboratories to submit claims to Medicare for genetic tests, requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.  Requisitions with a provider's signature were known as "doctors' orders."

26.     Medicare did not cover diagnostic testing that was not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 U.S.C. § 411.15(a)(1).

27.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposed additional regulations before covering the testing.  Title 42, Code of Federal Regulations, Section 410.32(a) provided that "all diagnostic x-rays tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, a physician who furnishes a consultation or treats a beneficiary for a specific medical

problem and who uses the results in the management of the beneficiary's specific medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

### COUNT ONE
### Conspiracy to Defraud the United States and to
### Pay and Receive Health Care Kickbacks
### (Violation of 18 U.S.C. § 371 (42 U.S.C. §§ 1320a-7b(b)(1) and (2))

28.     All previous paragraphs of this Indictment are realleged and incorporated by reference as though fully set forth herein.

29.     From in or around November 2020, and continuing through in or around April 2022, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant,

**KEITH J. GRAY,**

did knowingly and willfully combine, conspire, confederate, and agree with Scott Wohrman, David Heneghan, Co-conspirator-1, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in its administration and oversight of Medicare;

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering to pay, and offering and paying, any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, to any person to induce such person to purchase, lease, order, and arrange

for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program; and

        c.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program.

### Object/Purpose of the Conspiracy

30.    It was an object/purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves and others known and unknown to the Grand Jury by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for ordering and arranging for ordering cardio genetic tests; (b) submitting and causing the submission of false and fraudulent claims to Medicare for cardio genetic tests that were ordered and procured through kickbacks and bribes, ineligible for reimbursement, and not medical necessary; (c) concealing the submission of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds of the fraud, and the receipt and payment of kickbacks and bribes; and (d) diverting proceeds of the fraud for their personal use and benefit, for the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

31.     The manner and means by which **Gray** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

a.     **Gray** falsely certified to Medicare that he would comply with all applicable Medicare laws, rules, regulations, and program instructions, including the Anti-Kickback Statute, and that he would not knowingly present or cause to be presented false or fraudulent claims for payment by Medicare, or submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

b.     **Gray** and others offered and paid, and caused the offer and payment of, kickbacks and bribes, through the Laboratories and KHH, to Wohrman, Heneghan, Co-conspirator-1, and others, to induce Wohrman, Heneghan, and Co-conspirator-1 to order and arrange for ordering cardio genetic tests from the Laboratories.

c.     Wohrman, Heneghan, and Co-conspirator-1 solicited and received kickbacks and bribes from **Gray** and others, through the Laboratories and KHH, in return for ordering and arranging for ordering cardio genetic tests from the Laboratories,

d.     In exchange for the kickbacks and bribes paid by **Gray** and others, Wohrman and Heneghan arranged for others to obtain DNA specimens, insurance and other personally identifiable information from Medicare beneficiaries, and completed doctors' orders for cardio genetic tests, and caused the foregoing materials to be transmitted to the Laboratories for the purpose of performing cardio genetic tests billed to Medicare.

e.     With **Gray**'s knowledge, Wohrman and Heneghan, through AHS, and Co-conspirator-1, through Company-2, engaged telemarketers to contact Medicare

beneficiaries and persuade them to submit DNA specimens, insurance information, and other personally identifiable information, for the purpose of performing cardio genetic tests.

      f.     With **Gray**'s knowledge, Wohrman, Heneghan, and Co-conspirator-1 engaged Company-1 to engage in "doctor chase," that is, to contact Medicare beneficiaries who had agreed to submit DNA specimens for cardio genetic tests, obtain contact information for the beneficiaries' primary care physician or other physician, solicit a completed doctor's order by repeatedly faxing or otherwise transmitting a requisition form to the physician with the suggestion that the patient had "qualified" for genetic testing, and transmit the DNA specimens, the beneficiaries' insurance and other personally identifiable information, and the completed doctors' orders to the Laboratories for the purpose of conducting cardio genetic tests billed to Medicare.

      g.     In order to facilitate the payment of illegal kickbacks and bribes, **Gray**, among other things, (1) texted Wohrman the number of DNA specimens and completed doctors' orders that AHS and Company-2 had caused to be sent to the Laboratories, the number of cardio genetic tests for which Medicare reimbursed the Laboratories, and the per-sample kickback and bribe payments **Gray** owed for each, pursuant to their agreement; (2) transmitted and caused to be transmitted, from the Axis Account and the Kingdom Lab Account to the AHS Account, wire transfers reflecting agreed per-sample amounts; and (3) sent Wohrman and Heneghan summaries detailing the number of DNA specimens and completed doctors' order received at the Laboratories and the number of completed cardio genetic tests reimbursed by Medicare.

h.      **Gray** diverted for himself an additional portion of the Medicare reimbursements for cardio genetic tests procured through the payment of kickbacks and bribes to Wohrman and Heneghan by adding additional sums to the kickback and bribe payments, beyond the agreed per-sample amount, which sums Wohrman paid back to **Gray** personally through the KJ Gray Holdings Account.

i.      **Gray**, Wohrman, Heneghan, Co-conspirator-1, and others concealed and disguised the scheme by, among other things, (1) creating and causing the creation of a sham contract that falsely described AHS' duties as marketing and advertising Axis' services; (2) creating and causing the creation of sham invoices to Parameno Health that identified the kickback and bribe payments as payments for marketing services at an hourly rate, when in truth and in fact the payments were based on per-sample fees; (3) referring, in written and oral communications within the Laboratories and among themselves, to the kickback and bribe payments as being for a "loan," "software," "technology," "discretionary bonuses," and "distributions" reflecting a purported 1% ownership by AHS in the Laboratories.

j.      **Gray**, Wohrman, and Co-conspirator-1 used encrypted text messaging applications, including Signal and WhatsApp, to conceal the solicitation and payment of kickbacks and bribes.

k.      **Gray** submitted and caused the submission by the Laboratories to Medicare of at least approximately $335 million in false and fraudulent claims for cardio genetic tests that were ordered and procured through the payment of illegal kickbacks and bribes to AHS and Company-2, ineligible for reimbursement, and not medically necessary.

As a result of these false and fraudulent claims, Medicare made payments to the Laboratories of at least approximately $54 million.

       l.     **Gray**, his co-conspirators, and others used the proceeds of the fraud and kickback scheme to benefit themselves and others, and to further the fraud.

### Overt Acts

     32.    In furtherance of the conspiracy, and to accomplish its objects and purpose, the conspirators committed and caused to be committed, in the Dallas Division of Northern District of Texas, and elsewhere, the following overt acts, among others:

       a.     In a WhatsApp message exchange between **Gray** and Wohrman, on or about January 28, 2021, **Gray** wrote, "7 more paid and 5 was approved to send to the lab. Should have more next week I'll send the wire first thing in the am. It's 26 [] even 2400 for me. Send the invoice." In response, Wohrman wrote, "Sweet and I'll send yours out right after. Shits about to start rollin!" The next day, Wohrman wrote, "A wire transfer in the amount of 26000 USD has been received from AXIS PROFESSIONAL LABS LLC into account XXXXX6377 . . . ."

       b.     On or about January 29, 2021, Wohrman emailed **GRAY** Invoice Number 000498 in the name of AHS for services purportedly provided to Parameno Health, listing an amount due of $26,000 for 65 hours of purported "marketing services" at $400 per hour.

       c.     On or about January 29, 2021, **Gray** caused the payment of an illegal kickback and bribe to Wohrman and Heneghan by causing a wire transfer from the Axis Account to the AHS Account, in the approximate amount of $26,000.

d.      In a Signal Chat message between **Gray** and Wohrman, on about May 5, 2021, Wohrman inquired, "How we lookin this week?"  **Gray** replied, "I have the final count here (66*1700 + 40 *2500) = $212,000 21,200 for me."

e.      On or about May 6, 2021, **Gray** caused the payment of an illegal kickback and bribe to Wohrman and Heneghan, by causing a wire transfer from the Axis Account to the AHS Account, in the approximate amount of $212,200.

f.      In a Signal Chat message between **Gray** and Wohrman, on about November 12, 2021, **Gray** wrote, "Good morning  (131*1700) + (255*2500) = $860,200 $77,200 for me." In response, Wohrman  wrote, "Finally! That's what I'm talking about! 🔥🍾❤️ ."

g.      On or about November 12, 2021, **Gray** caused the payment of an illegal kickback and bribe to Wohrman and Heneghan, by causing a wire transfer from the Kingdom Lab Account to the AHS Account, in the approximate amount of $860,200.

h.      In a Signal Chat message between **Gray** and Wohrman, on about December 23, 2021, **Gray** wrote, "(180*1700) + (211*2500) = $833,500  [] (29*1700) = $49,300 Me $78,200)." In response, Wohrman wrote, "Sweet!  There is a $anta Claus!"

i.      On or about December 23, 2021, **Gray** caused the payment of an illegal kickback and bribe to Wohrman and Heneghan, by causing a wire transfer from the Kingdom Lab Account to the AHS Account, in the approximate amount of $833,500.

j.      On or about March 24, 2022, in a Signal chat message between **Gray** and Wohrman, **Gray** wrote, "$703,800 (164*1700) + (170*2500) $66,800 for me. [Company-2] (35*1500)=$52,500  (17*2300)=$42,500." In response, Wohrman sent a

"thumbs up" emoji.

k.     On or about March 24, 2022, **Gray** caused the payment of an illegal kickback and bribe to Wohrman and Heneghan, by causing a wire transfer from the Kingdom Lab Account to the AHS Account, in the approximate amount of $703,800.

l.     In or around March 2022, **Gray** met in person at the Laboratories' offices in Dallas with Wohrman, Co-conspirator-1, and others, where discussion took place regarding making more timely payments to Co-conspirator-1 in exchange for DNA specimens and completed doctors' orders provided to Kingdom Lab.

All in violation of Title 18, United States Code, Section 371.

### COUNTS TWO THROUGH SIX
**Offer and Payment of Kickbacks and Bribes in Connection
with a Federal Health Care Program
(42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2)**

33.     Paragraphs 1 through 27 and 30 through 32 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

34.     On or about the dates set forth below, with respect to each count, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant,

**KEITH J. GRAY**,

did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, as

set forth below:

| COUNT | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|
| 2 | 01/29/2021 | $26,000 | Wire transfer from the Axis Account to the AHS Account |
| 3 | 05/06/2021 | $212,200 | Wire transfer from the Axis Account to the AHS Account |
| 4 | 11/12/2021 | $860,200 | Wire transfer from the Kingdom Lab Account to the AHS Account |
| 5 | 12/23/2021 | $833,500 | Wire transfer from the Kingdom Lab Account to the AHS Account |
| 6 | 3/24/2022 | $703,800 | Wire transfer from the Kingdom Lab Account to the AHS Account |

Each in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

### COUNTS SEVEN THROUGH NINE
**Monetary Transactions in Criminally Derived Property**
**(18 U.S.C. § 1957)**

35.     Paragraphs 1 through 27 and 30 through 32 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

36.     On or about the dates set forth in the table below, with respect to each count, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant,

**KEITH J. GRAY**,

did knowingly engage in and attempt to engage in the following monetary transactions

Indictment—Page 16

within the United States, by, through, and to a financial institution affecting interstate and

foreign commerce, in criminally derived property of a value greater than $10,000, such

transactions involving the proceeds of a specified unlawful activity, that is, conspiring to

defraud the United States and to pay and receive health care kickbacks, in violation of Title

18, United States Code, Section 371, and paying health care kickbacks, in violation of Title

42, United States Code, Sections 1320a-7b(b)(2):

| COUNT | Approximate Date | Approximate Amount | Description |
|---|---|---|---|
| 7 | February 28, 2022 | $142,884.46 | Check from KJ Gray Holdings Account to Texas Vehicle Exchange for 2022 Dodge Ram |
| 8 | March 4, 2022 | $119,274.68 | Check from KJ Gray Holdings Account to Texas Vehicle Exchange for 2021 Mercedes Benz |
| 9 | June 16, 2022 | $80,612.39 | Check from KJ Gray Holdings Account to Sewell Lexus for 2022 Lexus LS500 |

All in violation of Title 18, United States Code, Section 1957.

**Forfeiture Notice**
**(18 U.S.C. § 982(a)(7); 18 U.S.C. § 982(a)(1))**

37.     All previous paragraphs of this Indictment are realleged and incorporated by reference as though fully set forth herein.

38.     Pursuant to 18 U.S.C. § 982(a)(7), upon conviction for any of Counts One through Six, the defendant, **Keith J. Gray**, shall forfeit to the United States, any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the respective count.  The property subject to forfeiture includes, but is not limited to, the following:

- a "money" judgment in the amount of the gross proceeds traceable to the offense (e.g., at least $54,000,000 concerning Count One).

39.     Pursuant to 18 U.S.C. § 982(a)(1), upon conviction for any of Counts Seven through Nine, the defendant, **Keith J. Gray**, shall forfeit to the United States, any property, real or personal, involved in the respective offense, and any property traceable to such property.  The property subject to forfeiture includes, but is not limited to, the following:

- a "money" judgment in the amount of the value of the property involved in the offense (e.g., at least $142,884.46 concerning Count Six; $119,274.68 concerning Count Seven; and $80,621.39 concerning Count Eight).

40.     Pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. 982(b)(1), if any of the property described above, as a result of any act or omission of the defendant:

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the value of the property detailed as subject to forfeiture.

A TRUE BILL:

_____
GRAND JURY FOREPERSON

LEIGHA SIMONTON
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
GARY A. WINTERS
Trial Attorney
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: 202-598-2382
Gary.Winters@usdoj.gov

_____
BRYNN A. SCHIESS
Assistant Chief
Criminal Division, Fraud Section
1100 Commerce Street, 3rd Floor
Dallas, TX 75242
Telephone: (202) 374-3484
Brynn.Schiess@usdoj.gov

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

KEITH J. GRAY

INDICTMENT

COUNT 1:     CONSPIRACY TO DEFRAUD THE UNITED STATES AND TO
             PAY AND RECEIVE HEALTH CARE KICKBACKS
             Title 18, United States Code, Sections 371(42, United States Code
             1320a-7b(b)(1) and (2)).

COUNTS 2-6:  OFFER AND PAYMENT OF KICKBACKS AND BRIBES IN
             CONNECTION WITH A FEDERAL HEALTH CARE PROGRAM
             Title 42, United States Code 1320a-7b(b)(2)(B) and Title 18, United
             States Code 2.

COUNTS 7-9:  MONETARY TRANSACTIONS IN CRIMINALLY DERIVED
             PROPERTY
             Title 18, United States Code 1957.

             FORFEITURE NOTICE
                 (9 COUNTS + FORFEITURE)

A true bill rendered,

Lubbock _____          _____ Foreperson
Filed in open court this 12th day of June, 2024

                                                              _____ Clerk
SUMMONS TO ISSUE.

                              _____
                              UNITED STATES DISTRICT JUDGE

Indictment—Page 21