IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:24-CR-00250-S |
| v. | |
| KEITH J. GRAY (01) | |

## THE UNITED STATES OF AMERICA'S TRIAL BRIEF

The United States of America (the "government"), by and through the undersigned counsel, file this Trial Brief to orient the Court in advance of the pretrial conferences scheduled in this matter. Through two laboratories he controlled, defendant Keith Gray paid millions of dollars in kickbacks to the owners of a purported "marketing" company. The company arranged to recruit Medicare beneficiaries and obtain signed doctors' orders for medically unnecessary cardiovascular genetic tests, which Gray's labs billed to Medicare to the tune of almost $330 million. Because of its size and the number of claims it receives, Medicare trusts enrolled providers, like Gray, to submit claims only for items and services that are medically necessary and not tainted by illegal kickbacks. Gray abused that trust.

Trial is scheduled to commence on February 24, 2025. The government here provides the Court with a high-level overview of the anticipated trial evidence and evidentiary issues that may arise. The intention is to limit disruption while the jury is present, enhance the presentation of evidence to the jury, and ensure that the trial proceeds efficiently.

I.  **CHARGES IN THE INDICTMENT**

Defendant Keith Gray is charged in a nine-count Indictment (Dkt. 1):

- **Count One** charges Defendant with conspiracy to defraud the United States and to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 (42 U.S.C. §§ 1320a-7b(b)(1) and (2)).

- **Counts Two through Six** charge Defendant with paying kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2.

- **Counts Seven through Nine** charge Defendant with engaging in monetary transactions in criminally derived proceeds, in violation of 18 U.S.C. § 1957.

II.  **ANTICIPATED TRIAL EVIDENCE**

From approximately November 2020 through April 2022, Gray and his co-conspirators devised and engaged in a scheme to make money from Medicare through the submission of kickback-tainted claims for medically unnecessary cardiovascular genetic tests.  These tests, when used in an appropriate clinical setting, use genomic sequencing at the cutting edge of medicine and can provide cardiologists with valuable information about their patients' future risk of cardiovascular disease.  But the Defendant did not bill for tests that enhanced patient care.  Instead, he and his co-conspirator "marketing" partners treated Medicare beneficiaries as mere commodities, using third parties to find elderly people who naturally wanted to know their risk of disease and then chasing down their primary care physicians to "order" the tests on the pretense that the patients had been properly qualified.  Defendant paid his co-conspirators handsomely for the privilege of billing Medicare for each patient—precisely what the Anti-Kickback Statute was designed to prevent.

Gray controlled and operated Axis Professional Labs ("Axis") and Kingdom Health Laboratory ("Kingdom").  Through these labs' bank accounts, he paid kickbacks to

Indiana-based American Health Screening ("AHS"), owned and operated by Scott Wohrman and David Heneghan, in exchange for DNA samples and signed doctors' orders for cardiovascular genetic tests for Medicare beneficiaries.[1]  AHS served as a turnkey operation for Gray: it used third-party telemarketers, Internet advertisements, and other means to recruit beneficiaries, and it engaged a purported telemedicine company called Open Med to obtain the DNA samples and "doctor chase," *i.e.*, obtain signed orders from the beneficiaries' own physicians.  The kickback arrangement was simple: in exchange for per-sample payments from Gray, AHS provided the swabs and signed orders to Gray's laboratories, which performed or outsourced the tests and submitted claims to Medicare; then, once Medicare paid Gray's laboratories on the claims, Gray paid AHS the second half of its per-sample kickback. Gray also diverted a portion of the kickbacks to himself by adding additional sums to the payments he made to AHS, which AHS then paid back to Gray's personal account.  This kickback arrangement (as well as the additional sums Gray diverted for himself) is thoroughly documented in cell phone communications between Gray and his co-conspirators.

Gray then spent proceeds of the fraud on three luxury vehicles—a Dodge Ram truck, a Lexus sedan, and a Mercedes SUV, as the evidence in support of the three money laundering charges in Counts 7 through 9 will illustrate.

---

[1] Wohrman and Heneghan have pleaded guilty to some of the same crimes with which Defendant Gray is charged, namely conspiracy to defraud the United States and to pay and receive health care kickbacks, as well as substantive kickback counts.  Both are cooperating with the government.  *See United States v. Wohrman et al.*, No. 3:22-CR-267-S, Dkts. 4, 5, 6, 7, 8 (SEALED), 9 (SEALED) (N.D. Tex.) (Scholer, J.).

The scheme is illustrated in the below graphic, which the government intends to introduce as a demonstrative exhibit to aid the jury during trial:



A. **Anticipated Government Witness Testimony**

<u>The Scheme</u>

Among other witnesses, Scott Wohrman is expected to testify about how the scheme operated. Wohrman will testify that he paid third-party companies, including Open Med, hundreds of thousands of dollars a month to do the following, which he explained in detail to Gray:

- *Find beneficiaries*: Telemarketers (not from AHS but from third-party companies paid by AHS) essentially cold-called Medicare beneficiaries.

- *Confirm their eligibility*: If a beneficiary expressed interest in a cardio genetic test and was "pre-qualified" by a telemarketer, they would be transferred to Open Med. An Open Med representative would "qualify" the beneficiary for a test based on questions about heart conditions and family

> medical history.  Open Med would also obtain the name of the beneficiary's primary care physician.
>
> - *Get the sample and doctor's order*: If the beneficiary agreed to take the test, Open Med sent them a DNA collection kit.  Beneficiaries followed the instructions in the kit to provide a saliva specimen and then returned the kit to Open Med, who in turn sent the specimens to Axis or Kingdom.  Open Med also sought to obtain a signed prescription from the beneficiary's primary care physician. This process was called a "doc[tor] chase," and involved Open Med sending a pre-filled lab requisition form to the beneficiary's primary care physician for signature.

Wohrman will also testify to the kickback agreement with Gray, explaining that Gray agreed to pay a set fee for each sample that AHS sourced for Axis or Kingdom. Wohrman will explain that Gray agreed to make two payments for each sample: First, Gray paid AHS $1,500 when the sample and corresponding signed order were received by Axis or Kingdom and the labs could confirm that the patient had Medicare benefits.  Axis or Kingdom then submitted claims to Medicare based on each AHS referral.  Second, Gray paid AHS $2,300 per sample after the claims were submitted and the lab received reimbursement from Medicare.  Further, as Wohrman will explain, there was a separate "side agreement" where Gray added $200 to each payment he made to AHS, which AHS paid back into Gray's personal bank account.  The evidence will show that Gray referred to these additional payments as "for me".

Finally, Wohrman will testify to the conspirators' various attempts to disguise the scheme to make the kickback payments seem legitimate.  Initially, Gray and AHS operated under a sham "marketing contract."  AHS, through Wohrman and Heneghan, sent Gray fake invoices at his request for purported "marketing" services at an hourly rate—a description used to conceal what the payments were really for: per-sample referrals.

Wohrman and Heneghan will testify that the invoices reflected the total amount Gray owed AHS for cardio genetic testing referrals, and they simply backed into whatever number of purported "marketing" hours would add up to the total amount Gray owed AHS in kickbacks, based on per-sample payments for a particular number of samples.

Later, Gray referred to his AHS payments as "loan repayments," though Wohrman, along with Gray's bookkeeper, will testify that there never was a loan from AHS to the labs. Wohrman will also testify about Gray's excuse that the payments represented "distributions" based on AHS's purported 1% ownership in the labs—an interest, Wohrman will say, AHS never acquired. Wohrman's testimony will be corroborated by many of the text (or WhatsApp or Signal) messages he exchanged with Gray over the course of the scheme, including numerous communications that demonstrate the payments to AHS were made on a per-sample basis and not because of any of Gray's manufactured excuses.

Medicare and Medical Necessity

A Medicare representative is expected to testify that Medicare pays for items or services only if they are medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, and actually provided as represented. As a trust-based system, Medicare relies on the truthful and accurate submissions of its providers, including laboratory owners and operators like Gray. Medicare does not pay for items or services that were procured through kickbacks and bribes. The representative will explain that Medicare does not cover claims for items and services based on kickbacks because such arrangements undermine medical decision-making and incentivize the submissions of

claims that are not medically necessary. The government will present Medicare claims data and summary exhibits, pursuant to Federal Rule of Evidence 1006, showing that during the relevant period, Axis and Kingdom billed Medicare approximately $328 million and were paid over $52 million based on kickbacks paid to AHS in exchange for cardio genetic testing referrals.

Dr. Rajat Deo, a cardiovascular genetic testing expert, is expected to testify that it is not appropriate to use these tests as a routine screening tool in the general population. Instead, the tests should be used for a specific medical decision-making purpose. Thus, it is essential that the tests be ordered by a medical professional who is knowledgeable about the proper uses of cardio genetic tests, who is treating the patient and uses the results in the patient's treatment, and who can appropriately counsel the patient about the benefits and risks of these tests. Dr. Deo will explain that cardiovascular genetic testing typically should not be the first step in managing a patient's cardiac-related symptoms or illness, particularly for a patient with no diagnosed first-degree familial cardiac genetic mutation. He is also expected to testify about some of the testing conducted on specific patients in this case and how it was not medically appropriate.[2]

The government may also call Medicare beneficiaries who received cardiovascular genetic testing submitted by Gray's laboratories, as well as those physicians who signed the orders for the tests. The beneficiaries will testify how they were contacted about genetic testing via telephone and how no doctor has ever reviewed the results of any genetic testing

---

[2] The government provided the applicable written notice of anticipated expert testimony pursuant to Federal Rule of Evidence 702 and Federal Rule of Criminal Procedure 16.

with him/her. The beneficiaries' physicians who reviewed or signed the orders for genetic testing may testify that they did not receive the results of the genetic test and did not discuss them with the beneficiary.

## Additional Details of the Scheme

Additional witnesses will testify about other important aspects of the scheme. For example, a marketer who has signed a plea agreement in connection with a different health care fraud scheme in another district and is cooperating with the government, and who brought additional cardio genetic testing referrals to Gray as a "submarketer" under Wohrman, will testify about how he obtained the samples using the same methods as AHS: he contracted with third-party companies to find the beneficiaries and chase down their doctors, and he received kickbacks from Gray (paid through AHS).

By way of another example, one of the minority owners of the laboratories will testify about how Gray told him the payments to AHS were for software leads and how that was strange because AHS was not a software manufacturer nor in the software business. Further, employees of Axis and Kingdom are expected to testify about how, for example, they never saw any documentation to support Gray's story that the payments to AHS were justified as loan repayment or by AHS's supposed 1% ownership. The labs' billing manager will testify about an internal spreadsheet he created at Gray's direction to track each sample resulting in claims submitted to Medicare that had been sourced through AHS. And finally, Gray's outside accountant will walk the jury through a series of emails that show how Gray's need to cover up the kickback payments required falsely instructing his accounting firm to retroactively record AHS having a 1% ownership in the labs for

purposes of the labs' tax returns. The witness will explain his questions about this supposed arrangement because the large payments to AHS were far in excess of what it would expect to receive as a 1% owner, and because Gray could not document any contributions by AHS for its purported interest.

<u>Money Laundering</u>

A forensic accountant will testify about the criminal proceeds from the scheme and how they were traced to Gray's purchase of the three luxury vehicles identified in Counts Seven through Nine of the Indictment.

### B.    Anticipated Government Exhibits

The government's anticipated exhibits include, among other materials: the laboratories' Medicare enrollment applications, signed by Gray, and related documentation; Medicare claims data and charts summarizing it; communications between Gray and Wohrman; financial records; Medicare beneficiary medical records; internal communications among Axis and Kingdom employees, including Gray; and communications between Gray and his accountants.

### III.    EVIDENTIARY ISSUES

On January 16, 2025, the government emailed counsel for Defendant requesting a meeting to discuss pretrial matters. Specifically, the government hoped to propose exhibit stipulations, including regarding the authenticity of evidence for which the government supplied business records affidavits pursuant to Federal Rule of Evidence 902(11) such that no witness should be needed to admit the records under Rule 803(6). The government emailed counsel for Defendant again on January 22 and again on January 24. To date, the

government has not received any response. To avoid unnecessary delays and to resolve as many pretrial issues as possible before appearing before the Court, the government respectfully requests that the Court order counsel for the Defendant to confer with counsel for the government before the status conference scheduled for February 3. Otherwise, the government may be forced to call several additional witnesses simply to authenticate documents, unnecessarily lengthening the trial.

The government also anticipates Defendant's response to the government's motion regarding Notice of Intent to Assert Advice-of-Counsel Defense and Related Discovery to be filed by January 29. (*See* Dkt. 27, ordering defense response). Depending on the nature of the response, the parties and the Court should also discuss at the February 3 status conference what additional steps need to be taken to ensure that the trial proceeds efficiently and without unnecessary delays.

(Continued on the next page.)

          Respectfully submitted,

          CHAD MEACHAM
          ACTING UNITED STATES ATTORNEY

          GLENN S. LEON
          CHIEF, FRAUD SECTION
          CRIMINAL DIVISION

By:   *s/ Brynn A. Schiess*
          Adam Tisdall, Trial Attorney
          Brynn A. Schiess, Assistant Chief
          Fraud Section, Criminal Division
          U.S. Department of Justice
          1100 Commerce Street, Third Floor
          Dallas, Texas 75242-1699
          Telephone:   (202) 374-3484 (Schiess)
          Telephone: (713) 567-9513 (Tisdall)
          Brynn.Schiess@usdoj.gov
          Adam.Tisdall@usdoj.gov

Dated: January 27, 2025